IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| SANDRA LYNETTE WALLACE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:20CV825 |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Sandra Lynette Wallace ("Plaintiff") brought this action pursuant to Section

205(g) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 405(g)), to obtain judicial

review of a final decision of the Commissioner of Social Security denying her claim for

Disability Insurance Benefits ("DIB") under Title II of the Act.  The parties have filed cross-

motions for judgment, and the administrative record has been certified to the Court for review.

I.     PROCEDURAL HISTORY

Plaintiff protectively filed her application for DIB on November 6, 2018, alleging a

disability onset date of September 22, 2011.  (Tr. at 16, 179-82.)[2]  Her claim was denied initially

(Tr. at 81-96, 110-14), and that determination was upheld on reconsideration (Tr. at 97-109,

---

[1] Kilolo Kijakazi was appointed as the Acting Commissioner of Social Security on July 9, 2021.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted for Andrew M. Saul as the Defendant in this suit.  Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Administrative Record [Doc. #9].

117-22). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 123-24.) Plaintiff attended the subsequent hearing on December 17, 2019, along with her attorney and an impartial vocational expert. (Tr. at 16.) Following the hearing, ALJ concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 27-28), and, on July 30, 2020, the Appeals Council denied Plaintiff's request for review, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-6).[3]

II.  LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992)

---

[3] Plaintiff filed a prior application for disability and disability insurance benefits in 2008, alleging a disability onset date of July 2006. (Tr. at 63.) Consultative examinations were undertaken in 2009, a hearing was held on September 21, 2010, and an ALJ denied Plaintiff's claims on November 18, 2010. (Tr. at 63-75.) Plaintiff did not appeal that determination. Instead, she filed a new application in 2018, which is the application at issue in the present case. As a result, Plaintiff's alleged onset date in this case became September 22, 2011. Her date last insured is December 31, 2011. Therefore, the present case only involves a determination whether Plaintiff was disabled during the roughly three-month period from September 22, 2011 through December 31, 2011.

2

(quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." <u>Hunter</u>, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." <u>Mastro</u>, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." <u>Hancock</u>, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" <u>Id.</u> (quoting 42 U.S.C. § 423(d)(1)(A)).[4]

---

[4] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 <u>et seq.</u>, provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[5] Step four then requires the ALJ to assess whether, based on

_____

Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

[5] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's

that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III.    DISCUSSION

Plaintiff previously filed an application for disability and disability insurance benefits, which was denied in a prior ALJ decision in 2010. (Tr. at 63-75.) Plaintiff did not appeal that determination. Instead, she filed a new application in 2018, which is the application at issue in the present case. She only claims DIB benefits under Title II, and her date last insured is December 31, 2011. Therefore, this case only involves a determination of whether Plaintiff was disabled during the roughly three-month period from September 22, 2011 through December 31, 2011.

---

"ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

The ALJ found that Plaintiff had not engaged in "substantial gainful activity" between her alleged onset date of September 22, 2011, and her date last insured of December 31, 2011. Plaintiff therefore met her burden at step one of the sequential evaluation process. (Tr. at 18.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments through her date last insured:

> multiple sclerosis, degenerative disc disease, obesity, and major depressive disorder[.]

(Tr. at 18.) The ALJ next found at step three that none of Plaintiff's impairments, individually or in combination, met or equaled a disability listing during the relevant time period. (Tr. at 20-21.) Therefore, the ALJ assessed Plaintiff's RFC and determined that, through her date last insured, Plaintiff had the RFC to perform sedentary work with:

> Lifting, carrying, pushing, or pulling 5 pounds frequently and 10 pounds occasionally in an 8-hour workday; frequently handling and fingering with both upper extremities; frequently stooping, crouching, kneeling, and crawling; and no balancing, climbing, or exposure to hazards such as unprotected heights and dangerous machinery. She could understand, remember, and carry out simple instructions consistent with a reasoning level of 3 in the *Dictionary of Occupational Titles* (DOT) and sustain the attention, concentration, and persistence to carry out those simple instruction over an 8-hour workday in 2-hour increments of time. She was precluded from jobs that would require complex decision-making, constant change, or dealing with crisis situations.

(Tr. at 21.) At step four of the sequential analysis, the ALJ found, based on the testimony of the vocational expert, that Plaintiff's past relevant work exceeded her RFC. (Tr. at 26.) However, at step five, the ALJ found that, given Plaintiff's age, education, work experience, RFC, and the testimony of the vocational expert as to these factors, Plaintiff was able to perform other jobs available in the national economy through the December 31, 2011 date

last insured. (Tr. at 26-27.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 27-28.)

Plaintiff contends that substantial evidence fails to support the ALJ's RFC finding in multiple respects. In terms of Plaintiff's mental RFC, she argues that the ALJ failed to properly evaluate evidence of Plaintiff's impaired intellectual functioning, including neuropsychological testing from Deborah Attix, Ph.D. (Pl.'s Br. [Doc. # 12] at 12.) In terms of Plaintiff's physical RFC, Plaintiff asserts that the ALJ failed to adequately consider (1) evidence that Plaintiff required a cane, (2) the medical source statement from Dr. Barrie Hurwitz, and (3) the impact of Plaintiff's hand numbness on her ability to manipulate objects. (Pl.'s Br. at 18, 20, 22.) Plaintiff further contends that, at step five of the sequential analysis, the ALJ failed to resolve an apparent conflict between the vocational expert's testimony and the Dictionary of Occupational Titles ("DOT"). After a thorough review of the record, the Court finds that none of Plaintiff's contentions merit remand.

A. Intellectual impairment

With respect to her mental impairments, Plaintiff contends that the ALJ failed to properly account for Plaintiff's limited intellectual functioning. In support of this argument, Plaintiff asserts that the ALJ failed to weigh the opinion of Deborah Attix, Ph.D., and her neuropsychology intern Lauren Warren, who administered a battery of neuropsychological tests to Plaintiff in June 2006. However, the ALJ clearly considered and addressed the neuropsychological testing at both step two of the sequential analysis and in formulating Plaintiff's RFC. Specifically, the ALJ recounted as follows at step two:

> On neuro-psychological testing in June 2006, when [Plaintiff] complained of difficulty with concentration and decreased cognitive function, she had a full-

scale IQ of 78 with her verbal abilities in the low average range and her non-verbal abilities in the borderline range. Her processing speed was in the low average range and her working memory was in the average range. Her executive functioning performance was generally within expected ranges and her language abilities were intact, although her learning and memory tests were variable with some performances below expectations. She had mostly normal visual-spatial abilities and average psychomotor speed. Evaluating psychologists Lauren Half Warren, M.A., and Deborah Attix, Ph.D., reported that [Plaintiff] showed some evidence of mild to moderate memory deficits, but they attributed her low test scores to multiple sclerosis-related demyelination with likely contributing mild to moderate depression rather than any specific intellectual disorder (Exhibit B-1F). The record also shows that [Plaintiff] completed four years of college and did skilled accounting work for approximately eight years.

Although [Plaintiff] continued to complain at times of difficulty concentrating related to her multiple sclerosis, a consultative psychiatric examiner reported in March 2007 that she could do serial threes and spell a word in reverse, and that she admitted being able to cook meals, drive, shop for groceries, and run errands (Exhibit B-12F). Her speech and mentation appeared intact on exams in 2008 and 2009. During the period in question, her mental functioning appeared normal on exam in November 2011 with intact recall and normal speech, fund of knowledge, and attention and concentration. As recently as August 2017, [Plaintiff] exhibited normal speech, memory, attention, and fund of knowledge (Exhibits B-4F, B-5F, B-6F, B-9F, B-10F, B-16F, and B-21F). In Function Reports completed in December 2018, [Plaintiff] indicated that she could manage her finances and shop in stores, by phone, and by mail, and her sister indicated she could shop online as well (Exhibits B-5E, B-6E, and B-7E).

Based on this evidence, the undersigned concludes that [Plaintiff's] hypertension and possible neurocognitive disorder cause no more than minimal limitations of her ability to perform work related activities and are not "severe" within the meaning of the Social Security Act and Regulations. However, the undersigned has considered all of [Plaintiff's] medically determinable impairments, including those that are not severe, when assessing [Plaintiff's] residual functional capacity.

(Tr. at 19.)[6]

_____

[6] Plaintiff argues that it was an "egregious error of law and fact" for the ALJ to find that Plaintiff's "intellectual impairment was not even severe at step two of the sequential evaluation process." (Pl. Br. at 17.) However, at step two the ALJ determined that Plaintiff's multiple sclerosis and depression were both severe, and considered all of Plaintiff's limitations, including mental limitations, resulting from those impairments. As reflected in the discussion quoted above, the ALJ found no separate neurocognitive impairment or intellectual disorder at step two, apart from Plaintiff's multiple sclerosis and depression. Plaintiff does not contend that she has an

8

Then, at step three of the sequential analysis, the ALJ further determined that Plaintiff's mental impairments resulted in moderate limitations in understanding, remembering or applying information, and in concentrating, persisting or maintaining pace, with mild limitations in interacting with others and in adapting or managing oneself. (Tr. at 21.) In formulating Plaintiff's mental RFC, the ALJ considered the record at length (Tr. at 22-26), including the prior 2010 ALJ decision, which she gave great weight. This is consistent with Social Security Administration Acquiescence Ruling 00-1(4), which implements Albright v. Comm'r, 174 F.3d 473 (4th Cir. 1999) in the Fourth Circuit. Under AR00-1(4),

> where a final decision of SSA after a hearing on a prior disability claim contains a finding required at a step in the sequential evaluation process for determining disability, SSA must consider such finding as evidence and give it appropriate weight in light of all relevant facts and circumstances when adjudicating a subsequent disability claim involving an unadjudicated period.
> . . . .
>
> In determining the weight to be given such a prior finding, an adjudicator will consider such factors as: (1) whether the fact on which the prior finding was based is subject to change with the passage of time, such as a fact relating to the severity of a claimant's medical condition; (2) the likelihood of such a change, considering the length of time that has elapsed between the period previously adjudicated and the period being adjudicated in the subsequent claim; and (3) the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim.

AR 00-1(4); see also Albright, 174 F.3d at 476 and n.4 (holding that a new claim should not be denied solely on the basis of a previously denied claim without evaluating potential changed circumstances, and noting that "the customary principles of preclusion apply with full force"

---

intellectual disability separate and apart from her multiple sclerosis, so it is not clear how she contends the ALJ erred in this regard. Moreover, the ALJ noted that all impairments, including those that were not severe, were considered in setting Plaintiff's RFC. Thus, any error at step two was harmless in any event since all of Plaintiff's impairments were considered in setting the RFC.

when a claimant's "second or successive application seeks to relitigate a time period for which the claimant was previously found ineligible for benefits"). Notably, the 2010 ALJ decision took Dr. Attix's report into consideration along with the report of the consultative examiner Dr. Gibbs. (See Tr. at 66.) The ALJ in the present decision gave great weight to that 2010 ALJ determination, finding that "the overall record shows [Plaintiff's] physical and mental conditions remained stable in the time between his decision and [Plaintiff's] date last insured a little over 13 months later. Also, the current evidence does not establish a basis for making a different finding with respect to the period being adjudicated in the current claim." (Tr. at 25-26; see also Tr. at 22, 24-25 (noting that MRI scans in 2015 and 2018 showed no new or enhancing lesions compared to Plaintiff's January 2010 MRI; noting that Plaintiff's "mental status appeared normal in December 2009, and there is no report of examination or treatment again until November 2011, when her mental state appeared normal with intact recall and normal attention and concentration"; and noting Plaintiff's recent examinations and activity reports in 2017 and 2018, reflecting that Plaintiff "was able to prepare most meals, attend PTA meetings, assist her child with his homework, shop, drive, attend church, pay bills, and handle a savings account"). Thus, the ALJ's decision reflects that she specifically considered and addressed Dr. Attix's evaluation and report from 2006 (Tr. at 19), gave great weight to the prior 2010 ALJ decision which also included Dr. Attix's evaluation and report (Tr. at 25-26, 66), and specifically considered additional evidence since that time (Tr. at 25, 22, 24). [7]

---

[7] In the briefing, the parties dispute whether Dr. Attix's report is a "medical opinion." For claims filed after March 27, 2017, the Social Security regulations define a medical opinion as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the ability to perform the physical, mental, or other demands of work activity. 20 C.F.R. § 404.1513(a)(2). Dr. Attix's report contains detailed test results, noting areas in which Plaintiff's performance was deficient. (Tr. at 293-96.) Dr. Attix's assessment recounted "[c]onstructed acquisition and

10

Plaintiff also challenges the substance of the RFC, contending that Plaintiff's impaired intellectual functioning, if properly considered, would prevent her from performing work with a Reasoning Level of 3, as defined in the Dictionary of Occupational Titles. In the RFC, the ALJ found that considering the effects of Plaintiff's mental impairments, both severe and non-severe, Plaintiff could "understand, remember, and carry out simple instructions consistent with a reasoning level of 3 in the *Dictionary of Occupational Titles* (DOT) and sustain the attention, concentration, and persistence to carry out those simple instruction over an 8-hour workday in 2-hour increments of time." (Tr. at 21.) The ALJ also found that Plaintiff "was precluded from jobs that would require complex decision-making, constant change, or dealing with crisis situations." (Tr. at 21.)

The DOT includes an evaluation of occupations including many factors, one of which is a Reasoning Development scale. That scale has six levels—Level 1 requires the least reasoning ability, and Level 6 requires the most reasoning ability. See DOT, App. C, 1991 WL 688702. Jobs with a Reasoning Level of 3 require that the individual "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and "[d]eal with problems involving several concrete variables in or from standardized situations." U.S. Dept. of Labor, DOT, App. C, 1991 WL 688702. Although Plaintiff now argues that her

---

inefficient retrieval across memory tasks with a marked nonverbal memory deficit; nonverbal processing compromises as observed on tasks of three dimensional visuoconstruction; [and] slowed processing speed." (Tr. at 295.) However, the report does not include any opinion regarding what Plaintiff could still do despite her impairments, nor does it opine on Plaintiff's limitations or restrictions on her ability to perform the demands of work activity. In any event, to the extent the testing did reflect that Plaintiff's IQ scores fell in the borderline range and that Plaintiff experienced problems in terms of memory and processing, that testing was addressed in the ALJ's decision, as discussed above. (Tr. at 19, 293-96.) Moreover, Dr. Attix's testing and report were considered in the prior proceeding, and the ALJ gave great weight to the 2010 ALJ decision, consistent with Albright as discussed above.

low average to borderline IQ scores would prevent her from performing such tasks, no provider, including Dr. Attix, opined that this was the case. Moreover, as noted above, the ALJ assigned "great weight" to Plaintiff's prior 2010 administrative hearing decision. (Tr. at 25.) With respect to Plaintiff's mental impairments in the 2010 ALJ decision, the RFC reflected that Plaintiff could:

> apply commonsense understanding to carry out instructions furnished in written, oral or diagrammatic form and deal with problems involving several concrete variables in or from standardized situations . . . [but] would be precluded from jobs that would require complex decision making, constant change, or dealing with crisis situations.

(Tr. at 69.) Notably, the RFC limitation to "apply[ing] commonsense understanding to carry out instructions furnished in written, oral or diagrammatic form and deal[ing] with problems involving several concrete variables in or from standardized situations" directly tracks the definition of Reasoning Level 3 in the DOT. The ALJ in the present case gave that determination great weight, and then included the same limitation in the current RFC by incorporating the limitation to Reasoning Level 3 from the DOT, finding that "the current evidence does not establish a basis for making a different finding with respect to the period being adjudicated in the current claim." (Tr. at 25-26.) As discussed above, the ALJ discussed that evidence at length. In the circumstances, substantial evidence supports the ALJ's evaluation of Plaintiff's mental abilities, including her intellectual abilities, and the ALJ's analysis of the evidence is sufficient to build a logical bridge to the ALJ's conclusions.

B. Cane use

Plaintiff next argues that the ALJ failed to adequately consider evidence suggesting that Plaintiff required the use of a cane. In particular, Plaintiff points to physical therapy progress

12

notes from September to November 2018, in which the use of a cane or walker was recommended for use on "bad days" (Tr. at 660, 663, 673, 771-72, 775), as evidence that she required an assistive device during the time period at issue. However, as Defendant correctly notes, the evidence highlighted by Plaintiff reflects her condition nearly seven years after her date last insured.[8]

In contrast, the ALJ fully considered evidence closer in time to Plaintiff's alleged disability period and found as follows:

> Although there [was] little evidence regarding [Plaintiff's] physical impairments during the period in question from September 22, 2011 to December 31, 2011, medical records before or after the period show her musculoskeletal and neurological conditions along with obesity were chronic in nature and generally stable with no evidence on any increased severity during those three months. Her MS was well controlled on medication with no ongoing and significant neurological deficits. She had only mild to moderate degenerative changes on her lumbar spine with good ranges of motion and full strength of her extremities as well as a normal gait despite her excess weight.

(Tr. at 23.) As part of this determination, the ALJ considered medical records from 2009 through 2011 reflecting Plaintiff's ability to walk and her normal gait. (Tr. at 22-23, 374-76, 379, 382, 390, 573, 577, 862, 866.) In addition, the ALJ specifically agreed with the July 2009 opinion of consultative examiner Dr. Ellis that Plaintiff was not limited in sitting and "does not need to use an assistive device for ambulation." (Tr. at 23, 376-77.) The ALJ nevertheless limited Plaintiff to sedentary work, the most restrictive exertional level under the Social Security regulations, and one which requires walking no more than 2 hours in an 8-hour workday. (Tr. at 23); 20 C.F.R. § 404.1567(a). Because Plaintiff suggests no evidence reflecting

---

[8] Indeed, Plaintiff's Function Report reflects that a walker was prescribed in 2018 (Tr. at 247), and the report from Plaintiff's sister reflects that a walker was prescribed in 2018 and a cane was prescribed in 2015-16 (Tr. at 231), which is consistent with physical therapy notes in 2018 first reflecting a worsening condition and falls leading to recommendation of a cane or walker, seven years after the relevant time period.

13

her need for an assistive device between September 22, 2011 and December 31, 2011, the Court finds no basis for remand.

C. Dr. Hurwitz' opinion evidence

Plaintiff next argues that the ALJ failed to sufficiently consider Dr. Hurwitz's November 2009 medical source statement in accordance with the regulations. Under the applicable regulations for claims filed on or after March 27, 2017,[9]

> [The ALJ] will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources. When a medical source provides one or more medical opinions or prior administrative medical findings, we will consider those medical opinions or prior administrative medical findings from that medical source together using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. . . .
>
> (1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.
>
> (2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.
>
> (3) Relationship with the claimant . . . [which includes]: (i) Length of the treatment relationship. . . (ii) Frequency of examinations. . . . (iii) Purpose of the treatment relationship. . . . (iv) Extent of the treatment relationship. . . [and] (v) Examining relationship. . . .
>
> (4) Specialization. The medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative

---

[9] In 2017, the Social Security Administration revised its regulations governing the analysis of opinion evidence. Under the new regulations, for claims filed on or after March 27, 2017, decision-makers must consider the persuasiveness of each opinion as set out above.

> medical finding of a medical source who is not a specialist in the relevant area of specialty.
>
> (5) <u>Other factors</u>. . . . This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements. . . .

20 C.F.R. § 404.1520c(a) and (c). The regulations also require decision-makers to "articulate in . . . [their] decisions how persuasive [they] find all of the medical opinions . . . in [a claimant's] case record." 20 C.F.R. § 404.1520c(b). Although all of the factors listed in paragraphs (c)(1) through (c)(5) of § 404.1520c should be considered in making this determination, the regulations specifically provide that the most important factors when evaluating the persuasiveness of an opinion are the first two: supportability and consistency. 20 C.F.R. § 404.1520c(a), 404.1520c(c)(1)-(c)(2).

In this case, Dr. Hurwitz, Plaintiff's treating neurologist, completed a single page, check-box medical source statement, in which he indicated that, as of November 18, 2009, Plaintiff

> has significant disorganization of motor function in two extremities with variable rather than sustained disturbance of gross and dexterous movements or gait and station, and significant and reproducible fatigue of motor function with substantial muscle weakness on repetitive activity that is demonstrated to result from neurological dysfunction in areas of the central nervous system known to be associated with [multiple sclerosis.]

(Tr. at 24 (citing Tr. at 378).) However, the ALJ ultimately determined that Dr. Hurwitz's statement was "not persuasive because it is not supported by objective medical evidence of record, including his own treatment notes and objective findings." (Tr. at 24.) The ALJ further described the findings conflicting with Dr. Huwitz's opinion as follows:

15

Dr. Barry Hurwitz reported in October 2009 that the claimant had mild hyper-reflexia of her legs but could ambulate quite well with no apraxia of gait, intact sensation throughout, and no cerebellar signs. He characterized her MS as "relatively stable" (Exhibit B-8F). Although the claimant complained of headache with subjective right-sided weakness in December 2009, her objective neurological exam at the time was unremarkable and her gait was normal (Exhibits B8F, B-9F, and B-10F). Her neurological exam remained normal in April 2010, and no objective abnormalities were noted on exams in November 2011 and March 2012. The claimant had no significant neurological deficits on subjective exams in April 2013 and October 2013. On the latter occasions, Dr. John Scagnelli reported that the claimant had intact sensation, reflexes, and concentration with normal motor function and a normal gait except for some difficulty tandem walking (Exhibits B-13F, B-14F, B-15F, and B-21F). A January 2013 neuro-ophthalmological exam showed no evidence of MS-related vision problems (Exhibit B-19F).

(Tr. at 22-23.) The ALJ also gave great weight to the prior 2010 ALJ determination, which had also considered Dr. Hurwitz's opinion and assigned it little weight. (Tr. at 25, 70.) This analysis is consistent with Albright and AR00-1(4), discussed above. The ALJ further noted that "although there is little evidence regarding the claimant's physical impairments during the period in question from September 22, 2011, to December 31, 2011, medical records before and after the period show her musculoskeletal and neurological conditions along with obesity were chronic in nature and generally stable with no evidence of any increased severity during those three months." (Tr. at 23.) The ALJ further noted that Plaintiff's "MS was well controlled on medication with no ongoing and significant neurological deficits. She had only mild to moderate degenerative changes on her lumbar spine with good ranges of motion and full strength of her extremities as well as a normal gait despite her excess weight." (Tr. at 23.) The ALJ therefore concluded that Plaintiff's impairments did not preclude sedentary work with further, non-exertional limitations. In particular, the ALJ determined that the "potential effects of [Plaintiff's] MS including extremity weakness and loss of focus or concentration

16

made it dangerous for her to balance, climb, or work with exposure to hazards such as unprotected heights and dangerous machinery." (Tr. at 23.) Under the current regulations, this discussion sufficiently articulates the ALJ's reasons for finding Dr. Hurwitz's opinion unpersuasive and places Dr. Hurwitz's findings in the context of the evidence as a whole. Accordingly, Plaintiff fails to identify a basis for remand.

D. Hand numbness

Plaintiff's challenge to her fingering and handling restrictions proves equally unpersuasive. Citing Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015), Plaintiff asserts that an RFC assessment "'must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).'" Id. (quoting SSR 96-8p, 61 Fed. Reg. 34,474, 34,478 (July 2, 2996)). She acknowledges that, under Mascio, "the lack of a narrative discussion does not constitute reversible error in every case" (Pl.'s Br. at 23), including, for example, cases in which a claimant's ability to perform a given function is "irrelevant or uncontested" Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013). However, "[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Mascio, 780 F.3d at 636. Plaintiff contends that her case falls in the latter category. In particular, she contends that the ALJ's failed to explain the basis for her finding that Plaintiff can finger and handle objects frequently, despite evidence of hand numbness which affects these abilities.

However, the ALJ's decision specifically adopted the findings of Plaintiff's prior 2010 administrative hearing decision. (Tr. at 25-26.) In the 2010 decision, the ALJ similarly limited Plaintiff to frequent handling and fingering (Tr. at 69), and included the following findings:

- Examining physician James Barber noted that, "if [Plaintiff's] fingers and hands were numb, then [she] would have difficulty with dexterity," and this opinion was "not inconsistent with the residual functional capacity contained in this decision." (Tr. at 70.)

- Examining physician Shannon Ellis "noted [that Plaintiff] did have some decreased sensation in her hands but ruled out any limitation for manipulation," and this opinion "supports in general the residual functional capacity reached in this decision." (Tr. at 70.)

- The State agency physician at the initial level, Alan Cohen, "found [that Plaintiff] was limited in handling (gross manipulation) and in fingering (fine manipulation). (Tr. at 70.)

- The State agency physician at the reconsideration level, Dorothy Linster, "did not find any manipulative limitations for [Plaintiff]." (Tr. at 70.)

Overall, the ALJ concluded that Plaintiff's "complaints of weakness and inability to use her hands," which included the alleged inability to "even lift a tissue box" due to numbness, "[were] not consistent with objective exams showing normal strength." (Tr. at 72-73.) Nevertheless, he limited Plaintiff to frequent handling and fingering in light of the above opinions and treatment notes, some of which indicated the potential need for manipulative restrictions. The ALJ in the present case gave great weight to this decision, adopted the same

18

limitation to frequent handling and fingering, and noted generally the lack of any evidence of increased severity through December 31, 2011 (Tr. at 23, 25-26), including unchanged MRIs (Tr. at 22), further noting that:

> Her neurological exam remained normal in April 2010, and no objective abnormalities were noted on exams in November 2011 and March 2012. The claimant had no significant neurological deficits on subjective exams in April 2013 and October 2013. On the latter occasions, Dr. John Scagnelli reported that the claimant had intact sensation, reflexes, and concentration[.]

(Tr. at 22-23.)  In addition, the ALJ specifically noted that Plaintiff did not complain of neck or left arm pain until 2013, and "there was no radiological evidence of cervical disc disease until May 2019." (Tr. at 23, 570.)  Plaintiff, in turn, points to nothing that would suggest a worsening of symptoms prior to December 31, 2011, or evidence not considered in the prior 2010 determination.  Because the ALJ's discussion permits "meaningful review" as required by <u>Mascio</u>, the Court finds no basis for remand.

E.  DOT conflict

Finally, Plaintiff argues that the jobs identified by the vocational expert at step five of the sequential analysis conflict with the RFC.  Specifically, Plaintiff contends that the ALJ failed to resolve an alleged "apparent conflict" between Plaintiff's RFC limitation to understanding, remembering, and carrying out simple instructions and the vocational expert's testimony that Plaintiff could perform jobs with a Reasoning Level of 3, as defined in the DOT.

The Fourth Circuit Court of Appeals has recognized that an ALJ has an affirmative "duty to make an independent identification of apparent conflicts" between VE testimony and the provisions of the DOT, regardless of whether a conflict is identified by the VE.  <u>Pearson</u>

19

v. Colvin, 810 F.3d 204, 208-09, 210 (4th Cir. 2015). In Pearson, because of an apparent conflict between the VE's testimony and the DOT, remand was required so that the ALJ could elicit a reasonable "explanation from the expert" before relying on the expert's testimony. Id. at 208-209, 211. In 2019, in Thomas v. Berryhill, the Fourth Circuit applied the principles articulated in Pearson as they related to the DOT's Reasoning Development scale. See Thomas v. Berryhill, 916 F.3d 307, 314 (4th Cir. 2019). As discussed above, that scale has six levels—Level 1 requires the least reasoning ability, and Level 6 requires the most reasoning ability. See DOT, App. C, 1991 WL 688702.[10] In Thomas, the vocational expert identified three jobs, all with a Reasoning Level of 2, "requir[ing] employees to 'carry out detailed but uninvolved written or oral instructions.' By comparison, Thomas's RFC limit[ed] her to jobs that involve only 'short, simple instructions.'" Thomas, 916 F.3d at 314 (internal citations omitted). The Fourth Circuit found

> that Thomas, being limited to short, simple instructions, may not be able to carry out detailed but uninvolved instructions. This is not a categorical rule— some instructions, particularly if they are well-drafted, may be simultaneously short, simple, detailed, and uninvolved. Even so, the conflict between Thomas's limitation to short, simple instructions and the VE's testimony that Thomas could perform jobs that include detailed but uninvolved instructions is as apparent as the conflict we identified in Pearson. Since we held that an apparent conflict existed in Pearson, we are satisfied that one exists in this case,

---

[10] Reasoning Levels 2 and 3, are defined as follows:

LEVEL 3
Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations.

LEVEL 2
Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.

U.S. Dept. of Labor, DOT, App. C, 1991 WL 688702.

too. We remand so that the ALJ can resolve the conflict in accordance with the Administration's regulations.

Id. at 314.

Consequently, in Thomas, the Fourth Circuit held that there was an apparent conflict between jobs requiring Level 2 reasoning and a limitation to "short, simple instructions." Id. However, in Lawrence v. Saul, 941 F.3d 140, 143 (4th Cir. 2019), the Fourth Circuit clarified that this conflict results from the restriction to "short" instructions, rather than the restriction to "simple" instructions or tasks.

> "Short" is inconsistent with "detailed" because detail and length are highly correlated. Generally, the longer the instructions, the more detail they can include. In contrast, the [ALJ] found that Lawrence could perform jobs limited to "simple, routine repetitive tasks of unskilled work." There is no comparable inconsistency between Lawrence's [RFC] . . . and Level 2's notions of "detailed but uninvolved . . . instructions" and tasks with "a few [ ] variables."

Id. (citations omitted). Thus, pursuant to Lawrence, the Fourth Circuit has held that a restriction to simple instructions is consistent with jobs with a DOT Reasoning Level 2. The Fourth Circuit has not further examined whether a limitation to simple instructions is also consistent with a Reasoning Level of 3.

Ultimately, however, that issue is inapposite in the present case. Here, as set out above, the RFC expressly provides that Plaintiff "could understand, remember, and carry out simple instructions consistent with a reasoning level of 3 in the [DOT]." (Tr. at 21.) In other words, the ALJ specifically determined that Plaintiff could perform jobs with a Reasoning Level of 3, and so specified in the hypothetical questions to the VE. (Tr. at 56.) Accordingly, the vocational expert's testimony identifying jobs with a Reasoning Level of 3 did not create any

apparent conflict to be resolved, and the ALJ was clearly entitled to rely on the expert's testimony without the need for further explanation.[11]

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be AFFIRMED, that Plaintiff's Motion for Judgment on the Pleadings [Doc. #11] be DENIED, that Defendant's Motion for Judgment on the Pleadings [Doc. #13] be GRANTED, and that this action be DISMISSED with prejudice.

This, the 28th day of January, 2022.

/s/ Joi Elizabeth Peake
United States Magistrate Judge

---

[11] Plaintiff argues that there is "an actual conflict between the ALJ's decision and the DOT." (Pl. Br. at 10.) However, the apparent conflict at issue in <u>Thomas</u> and <u>Pearson</u> was a conflict between the <u>VE's testimony</u> and the <u>DOT</u>, specifically where the VE identified jobs as consistent with a given RFC, but the description in the DOT was not consistent with the RFC. In the present case, there is no conflict between the VE testimony and the DOT; the ALJ provided a question limiting an individual to jobs with a Reasoning Level 3, the VE identified jobs with a Reasoning Level of 3, and there is no conflict with the DOT. It appears that Plaintiff's actual contention is not based on an inconsistency between the VE testimony and the DOT as in <u>Pearson</u> and <u>Thomas</u>, but rather a challenge to the RFC itself to the extent it includes a reference to "simple" instructions but defines that limitation as consistent with Reasoning Level 3. However, it is up to the ALJ to set the RFC, and here the ALJ clearly defined the limits of the RFC, which were consistent with the limits from the 2010 ALJ determination, and to the extent Plaintiff is simply challenging the substance of the RFC, that RFC determination is supported by substantial evidence as discussed above.